302 A.2d 785.

AMADEO PEREZ *et al. vs.* PAWTUCKET REDEVELOPMENT AGENCY *et al.*

APRIL 3, 1973.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

328

KELLEHER, J. We have consolidated two appeals taken from judgments entered in the Superior Court dismissing two separate civil actions in which the plaintiffs seek to bar the Pawtucket Redevelopment Agency (PRA) from acquiring their property by eminent domain. In each case, judgment was entered for the city of Pawtucket and the PRA. We stayed the taking pending this appeal. *Perez* v. *Pawtucket Redevelopment Agency*, 110 R. I. 915, 291 A.2d 272 (1972).

The plaintiffs are the owners of a parcel of real estate located in Pawtucket on the north side of Grace Street. The parcel contains a commercial building and a three

family dwelling located in a portion of Pawtucket which the city council in February, 1968 had designated as an urban renewal area. General Laws 1956 (1970 Reenactment) §45-32-4. Later, in November, 1970, the council enacted an ordinance approving a redevelopment plan for this area which had been formulated by the PRA with the assistance and advice of the United States Department of Housing and Urban Development. This plan, known as the Riverview Plan, contemplated that certain property on the south side of Grace Street be acquired so that the traffic pattern which channels vehicles in and about the western portion of the Division Street bridge could be improved.

Later, after consultation with various officials of the Division of Roads and Bridges of the Rhode Island Department of Transportation,[1] PRA decided that a safer and more efficient traffic pattern would evolve if PRA, instead of taking land lying to the south of Grace Street, acquired land to the north of that highway, specifically the Perez property. To effectuate this purpose, the city council adopted an ordinance amending the Riverview Urban Renewal Plan. The proposed amendment was introduced on September 22, 1971. Two public hearings relative to the adoption of the ordinance were held—one in October and the other in November, 1971. The amendment became law on December 10, 1971 and is entitled ch. 1317.

On December 29, 1971, plaintiffs filed a civil complaint in the Superior Court wherein they challenged the council's adoption on several grounds. It is conceded that prior to its November 24, 1971 meeting, the council assembled in the city clerk's office where they conferred with the city's traffic engineer who informed the legislators that he preferred taking the northerly land on Grace Street rather

---

[1]The street-widening project was part of a federal program to reduce hazardous highway conditions. The program is called TOPICS and is jointly funded by the federal, state and municipal governments.

than the southerly expansion called for in the original plan. The plaintiffs alleged in their complaint that their attorney and their traffic engineer were barred from the city clerk's office while the council heard from the municipality's traffic expert. Such action, they claimed, violated certain provisions of the Pawtucket City Charter requiring the council to hold "public meetings" and "public investigations."[2] They also charged that the ordinance was invalid in that the PRA exceeded the authority delegated to it by virtue of the urban redevelopment enabling legislation found in title 45, chs. 31 to 33 inclusive.

When a jury-waived trial was held in the Superior Court, all the testimony presented focused on the council's private meeting with the city's traffic engineer. It was agreed that plaintiffs' attorney and their traffic engineer were denied admittance to this meeting. The attorney and the engineer had appeared at the earlier public hearings and voiced their opposition to a northern widening of Grace Street. The trial justice, in a bench decision rendered on February 7, 1972, found that ch. 1317 satisfied the requirements of the state redevelopment statutes but that the off-the-record conference with the traffic engineer violated "public meetings" and "public investigations" provisions of the charter. He classified the discussion between the council and the engineer as an inquiry in furtherance of the council's legislative function.

A judgment was entered which enjoined the taking of the Perez property until such time as plaintiffs' counsel could hear the traffic engineer's testimony as nearly as it was given in the clerk's office in November. The plaintiffs took an appeal from this judgment.

At this point in time it was a new year and the makeup of the council had changed as the result of the November,

---

[2]The pertinent charter provisions are to be found in the appendix.

1971 election. Five of the seven councilmen who approved ch. 1317 had been re-elected. On February 9, 1972, a new ordinance which was almost a carbon copy of ch. 1317 was introduced and laid on the table. Later, on February 23, 1972, the council conducted the public meeting ordered by the Superior Court. The traffic engineer appeared and testified. The plaintiffs' counsel was present and he was allowed to question the witness. The council subsequently adopted the ordinance which is now known as ch. 1328. It became law on March 9, 1972. The plaintiffs returned to the Superior Court. They filed a new complaint which alleged that the amendment was a nullity because of a failure to comply with other sections of the charter which in essence state that no ordinance shall be passed until it has been read on two separate occasions with an additional requirement that there be a three-day interval between the readings. The plaintiffs also repeated their charge relative to the council's failure to comply with various portions of the redevelopment enabling legislation.

The second case was tried before the same trial justice who heard their earlier complaint. He found no violation of the charter and refused to consider the violations of the redevelopment statutes on the ground that they could have and should have been raised in the first hearing.

The plaintiffs first argue that once the trial justice found a violation of what could be described as the "open door" provisions of the charter, he should have voided ch. 1317. We cannot agree.

During the first trial, the city clerk told the trial justice that the get-together between the council and the engineer was part of the usual routine in which prior to each council meeting, the members gather in his office to go over the agenda. There the councilmen determine which individual will handle on the floor the various resolutions and ordinances awaiting action. Occasionally, a department head

or city employee might be asked to come to the meeting and give his views to the council on various legislative proposals and their effect on the municipal function or service with which he is concerned. Representatives of the press are present at such get-togethers. The trial justice described the tête-à-tête between the council and the traffic engineer as an "unintentional" violation of what might be described as the "open door" provisions of the charter. The trial justice went on to observe that throughout its consideration of the 1971 ordinance, the council acted in good faith without any intent to deprive plaintiffs' counsel of any "basic right."

The "public meetings" and "public investigations" provisions are to insure the citizen an opportunity to observe his elected representative on the council as he performs his tasks. The remedy fashioned by the trial justice was a most adept method of guaranteeing the Perez family's representative an opportunity to complete his observation of the council at work. The implementation of the amended plan was halted until the engineer appeared in public before the council. The plaintiffs' counsel was present and questioned the witness. This was far in excess of what the "open door" provisions contemplated. They assure the citizen a look, not a cross-examination. In fact, the trial justice made it clear that the council could, after hearing the traffic engineer, take any action it desired including the rejection of the proposed northerly taking. The council voted unanimously to affirm the earlier approval of the modification of the original renewal plan.

In upholding the trial justice's refusal to nullify the 1971 ordinance, we should point out that the issue of whether Grace Street should be widened by a taking of land to the north or the south was thoroughly discussed pro and con at the two public hearings conducted in the fall of 1971. Public officials, traffic engineers, citizens and chairmen of

various groups such as the West Riverview Project Area Committee appeared before the council and expressed their diverse views. The charter does not require either hearing. A public hearing is required only on budget ordinances or when the pending legislation has evoked such public interest that at least 25 qualified electors have filed a petition seeking a public hearing. Section 2-201 (10)(11).

We can find nothing in the "open door" sections of the charter which would warrant the nullification order now sought by plaintiffs.

In the final phase of their initial appeal, plaintiffs argue that the council failed to comply with provisions of the enabling legislation requiring a legislative declaration that the streets in the project area will be widened, that the plan contains adequate provisions for the payment to owners of property acquired by PRA, and that the federal funding which is available to the agency is necessary for the completion of the area's redevelopment. Sections 45-32-15, 16, 17. There is little need to spend any great length of time disposing of this argument other than to direct plaintiffs' attention to §45-32-20(d). There, it states that the declarations required by §§45-32-15, 16 and 17 shall be referred to specifically in the ordinance which *adopts* a redevelopment plan. This was done in 1970 when the city council enacted ch. 1273 and adopted the Riverview Redevelopment Plan. There was no necessity, therefore, for the council in 1971, when it *modified* the already adopted plan, to repeat the declaratory sentiments now relied upon by plaintiffs.

As we turn to the second appeal and the charter mandate for two separate readings, plaintiffs insist that this section contemplates a complete reading of each and every section of any ordinance awaiting action by the council. We cannot agree.

Testimony disclosed that in the almost 20 years since the charter first became the organic law for Pawtucket in

January, 1954, the reading requirement has been met by a reading of the title of the ordinance.

As the "open door" provisions of the charter are designed to allow the citizen to see his councilman at work, we likewise believe that the charter's reading requirements were designed to afford some assurance to the observing citizen that when he sees the councilman voting, the legislator is aware of what he is voting upon before he casts his vote. In *Bill Posting Sign Co.* v. *Atlantic City,* 71 N. J. L. 72, 58 A. 342 (1904), a reading requirement was satisfied if the reading of the title of the ordinance disclosed the object of the legislation.

The framers of the Pawtucket charter took several other steps in addition to the reading requirement to stimulate a councilman's legislative awareness. Section 2-201(2) provides that the title to an ordinance, such as ch. 1328, shall contain no more than one subject which shall be "clearly and adequately expressed."[3] The charter bars immediate consideration of any ordinance other than one dealing with an emergency. Section 2-201(5). And the city clerk is required to furnish each councilman with a printed or written copy of each proposed ordinance within 48 hours after its introduction. Section 2-201(7).

Section 45-32-20(e) specifies that when a legislative body adopts a redevelopment plan, the ordinance adopting such a plan shall incorporate the plan by reference. The Riverview Redevelopment Plan consists of over 50 pages plus 2 maps. If plaintiffs page-by-page concept be adopted, council meetings could evolve into endurance contests going on until the early hours of the morning rather than the

---

[3] It is generally held that this provision does not require the bill's title to be an index or synopsis of the details of a bill but it is sufficient if the title is so framed as to apprise a reasonable person interested in the subject matter of the legislation sufficiently so as to lead him to an inquiry into the body of the bill. *State* v. *Slattery,*   Del.  , 263 A.2d 284 (1970); *Harrisburg* v. *Pass,* 372 Pa. 318, 93 A.2d 447 (1953).

deliberative sessions envisioned by those who drafted and those who approved the charter. The adoption of legislation embodying such subjects as building codes and zoning ordinances would present a similar problem.

It is our belief that the charter's reading requirement is satisfied when the city clerk has read enough of the legislation before him so that the council has been alerted to its purport. The title of ch. 1328 is "Ordinance of the City Council of the City of Pawtucket Approving an Amendment to the Urban Renewal Plan for the Riverview Urban Renewal Area, Project No. R. I. A-1." From our examination of the record, we have no doubt that in 1972, when the city clerk completed his readings of the title of what is now ch. 1328, the Pawtucket City Council was well aware of the nature of the matter embodied within the legislation then awaiting its consideration.

The remaining issue to be resolved is the trial justice's refusal to permit plaintiffs to introduce testimony which supposedly would show that both the 1971 and 1972 ordinances violated several sections of the redevelopment legislation apart from those we have previously discussed. The plaintiffs concede that the doctrine of res judicata operates as an absolute bar to the relitigation of the same cause of action between them and defendants and a judgment rendered on the merits in the first case is conclusive not only to the issues which were determined but as to all matters which might have been determined as well. *Coates v. Coleman,* 72 R. I. 304, 51 A.2d 81 (1947). However, they contend that the doctrine does not apply because: (1) the second trial dealt with the 1972 ordinance, not the 1971 enactment, and in the event we do not concur in this view; plaintffs argue that the 1971 enactment is still subject to challenge not only because of (2) defendants' failure to file a plea of res judicata but they also argue that the appeal they have taken relative to the 1971 amend-

ment bars the invocation of the doctrine. We find no merit in any of these contentions.

Res judicata is a vehicle whose goal is the elimination of repetitive litigation. It deals with substance and not form. We agree with the trial justice that the 1972 ordinance was nothing more than a reenactment of the 1971 amendment to the Riverview Renewal Plan. The claims in both of plaintiffs' suits as they applied to the enabling legislation were identical.

We concede that under the Superior Court's Rules of Civil Procedure res judicata is an affirmative defense which if not pleaded shall be deemed to have been waived. Super. R. Civ. P. 8(c). However, under the circumstances in this record, we feel that the trial justice acted properly when, sua sponte, he invoked the doctrine.

Today, a trial judge is confronted with crowded dockets and numerous litigants who wish to have their controversies resolved. "Judge time" now rates as a precious commodity. Res judicata does not permit one the luxury of trying his case on the installment plan. No judge who has a litigant try an issue in February, 1972, must sit idly by and say nothing when three months later the same issue is sought to be litigated between the same parties simply because opposing counsel, through inadvertence or otherwise, has failed to file the proper affirmative plea. In such circumstances, the trial justice could take judicial notice of the prior action and determine that the cause previously before him posed the same issue decided at the earlier trial. *Abramson* v. *Grady*, 234 A.2d 174 (D.D.C. 1967).

The plaintiffs assert that since there was an appeal pending in the first suit, there was no final judgment which would permit the trial justice to apply the rule of res judicata. Such a contention raises a question of first impression in Rhode Island.

It is well settled that the rules of res judicata are not

applicable unless there is a final judgment. *See Lopes* v. *Mallory,* 108 R. I. 694, 279 A.2d 450 (1971). However, there are divergent views as to the effect of an appeal on the finality requirement and they can be found in 9 A.L.R.2d 984 (1950). *See also,* 2 Freeman, *Judgments* §722 (5th ed. 1925) and Restatement, *Judgments* §41, *comment* (d).

Freeman points out that the chief objection to the line of decisions which holds that an appeal suspends the doctrine of res judicata is that it enables one against whom a judgment is entered to avoid its force for a considerable period of time merely by taking an appeal. During that time, the unsuccessful litigant may carry on other controversies with the same parties involving the same issues and possibly obtain decisions contrary to the initial determination and which could not have been obtained had the former judgment been available to bar the second suit. This distinguished author acknowledges that the adoption of the rule which holds that an appealed judgment can be the basis for res judicata presents the possibility that if the first judgment is erroneous and reversed on appeal, its use as a bar to the second action could lead to another judgment from which it might be impossible to obtain relief notwithstanding the appellate court's reversal.

It is interesting to note that long ago in *Paine* v. *Schenectady Ins. Co.,* 11 R. I. 411 (1877), this court had the opportunity to discuss res judicata and the effect of a pending appeal. The *Paine* case was an action in assumpsit. The defendant's receiver filed a plea in which he alleged that a judgment in his favor had been entered against the plaintiff in the courts of New York. The plaintiff's replication asserted that the judgment had been appealed. This court first applied the law of New York, which held that a judgment, even though appealed, is a bar to an action involving the same parties in the same controversy, but then went on

338

to observe that because of the pendency of the New York appeal, it might be desirable to delay the entry of judgment here until the appeal was decided. Otherwise, the court observed, Rhode Island might be giving conclusive effect to a judgment which in New York, assuming a successful appeal, would be conclusive for a much shorter period of time.

On balance, we think the hazard of undue delay, with its potential of numerous trials and appeals, far outweighs the occasional risk of reversal which may be inherent in our adoption of what has been described as the majority rule.[4] We therefore hold that the plaintiffs' appeal from a judgment in the Superior Court did not prevent the trial justice's invocation of res judicata. In the future, we will leave it to the sound discretion of the individual trial justice as to whether, in situations such as the one now before us, final judgment on the second suit should be delayed until the pending appeal has been decided.

In each case, the plaintiffs' appeal is denied and dismissed, the stay previously issued by this court is dissolved, and the case is remanded to the Superior Court.

Petition for reargument denied.

Mr. Justice Powers participated in the decision but retired before its publication. Mr. Justice Doris did not participate.

---

[4]The rule is so described in *Denham* v. *Shellman Grain Elevator, Inc.*, 444 F.2d 1376 (5th Cir. 1971). It should be kept in mind that the rule applies only when the appellate court has no other duty than to affirm, reverse, or modify the judgment being appealed. The rule has no application where an appellate tribunal hears the case de novo. *See Salerno* v. *George A. Fuller Co.*, 71 R. I. 41, 42 A.2d 28 (1945).

APPENDIX

Charter
of the
City of
Pawtucket, Rhode Island (1953)

"Sec. 2-205. When council meetings to be public; action by council when meeting as committee of the whole.

The meetings of the council, except when the council shall be meeting as a committee of the whole, shall at all times be open and accessible to the public. No final action shall be taken on any matter by the council meeting as a committee of the whole, but all matters shall be voted upon by the council at an open meeting thereof."

"Sec. 2-403. Investigations to be public; exception when executive sessions are held.

All inquiries and investigations conducted by the council or any of its committees shall be open to the public provided, however, that except when taking testimony, executive sessions may be held if deemed necessary by the investigating body."

*William J. George, Louis J. Perez,* for plaintiffs.

*John F. Sherlock, Jr., Edward G. McLee,* for Pawtucket Redevelopment Agency; *Gerald J. Pouliot,* Assistant City Solicitor, for defendants.